IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOHN JOSEPH ROGERS,                )
                                   )
        Petitioner                 )
                                   )
    v.                             )    1:11cv1281 (LMB/TCB)
                                   )
EDDIE L. PEARSON, Warden Sussex I  )
State Prison,                      )
                                   )
        Respondent.                )

## MEMORANDUM OPINION

Before the Court is the petition of John Joseph Rogers ("Rogers"), a Virginia inmate proceeding through counsel, for a writ of habeas corpus under 28 U.S.C. § 2254. Rogers argues that for various reasons, including the ineffectiveness of his trial counsel, his conviction in the Circuit Court of Stafford County, Virginia, violated the United States Constitution and should be vacated. The petition also includes requests for discovery and for an evidentiary hearing. Respondent Eddie L. Pearson ("Respondent") filed a Rule 5 Answer and Motion to Dismiss on December 28, 2011, and a supplemental brief addressing the merits of Rogers' petition on May 23, 2012.[1]

---

[1] Respondent's original brief in support of his Motion to Dismiss argued that Rogers' petition was time-barred under 28 U.S.C. § 2244(d)(1), and that the ineffective assistance of counsel claims should be dismissed because Rogers failed to raise them in a timely state post-conviction petition. See generally Br. in Supp. of Rule 5 Answer and Mot. to Dismiss [Dkt. No. 6] ("Br. in Supp."). Respondent voluntarily withdrew the timeliness argument in his corrected brief, see Corrected Br. in Supp. of

Rogers filed a reply on June 12, 2012, and Respondent filed a sur-reply on July 10, 2012.  The matter having been fully briefed, it is now ripe for decision.  For the reasons that follow, Respondent's Motion to Dismiss will be granted, Rogers' petition will be dismissed, and the requests for discovery and an evidentiary hearing will be denied.

## I.   BACKGROUND

Rogers and Lisa Madaris ("Madaris"), a woman with whom he had a turbulent and intermittently intimate relationship, were seen together at Brittany's Sports Bar in Woodbridge, Virginia, on the evening of Wednesday, April 6, 2005.  Pet. for Writ of Habeas Corpus Under 28 U.S.C. § 2254 ("Pet."), at 2; Supplemental Br. in Supp. of Rule 5 Answer and Mot. to Dismiss ("Resp."), at 15.  After she left the bar that night, Madaris disappeared.  Pet. at 2; Resp. at 23.  Her burned car was found the following morning at a construction site parking lot in Stafford County, approximately twenty miles away from Brittany's.  Pet. at 2; Resp. at 19-20.

On Sunday, April 10, 2005, Madaris' body was found in an open field in Stafford County, about two or three miles from the Prince William County line.  Pet. at 2; Resp. at 19-20, 24.  The

---

Rule 5 Answer and Mot. to Dismiss ("Corr. Br.") [Dkt. No. 9], and an Order issued on March 22, 2012 [Dkt. No. 17] denied the motion to dismiss and ordered Respondent to file briefing on the merits of the instant petition.

autopsy established that the cause of death was "blunt force injuries to the head." J.A. 1812.[2] Her "entire face [was] gone, showing skull, teeth, jaw parts . . . to the left of her." J.A. 1539; see also Prosecution Ex. 205. Because some of her teeth and jaw parts were lying next to her body, there were indentations in the ground under her head, and there were no injuries or dirt on her bare feet, she was likely killed in the field where she was found. J.A. 1539, 1557-58, 1934-36, 3396.

Rogers was arrested in connection with these events on April 14, 2005, and was indicted for arson, murder, and abduction on September 6, 2005, as well as for two counts of capital murder on November 7, 2005. Pet. at 1; Resp. at 26. His jury trial began on August 16, 2006. J.A. 399.

At trial, Rogers' alibi was his primary defense to the murder charge. See J.A. 1440-41 (opening statement of defense) ("[W]hat the evidence will show you is that [Rogers] never went anywhere near the place that Lisa Madaris was killed at the time she was killed."); see also Rogers v. Commonwealth, No. 2954-06-4, at 7 (Va. Ct. App. Aug. 9, 2007) (per curiam) (observing that Rogers's defense "was that he was not present during the incidents.").

---

[2] "J.A." refers to the Joint Appendix filed in connection with Rogers' direct appeal to the Virginia Court of Appeals. See Rogers v. Commonwealth, No. 2954-06-4 (Va. Ct. App. Sept. 1, 2009).

The evidence established a strong alibi for Rogers from around 6:30 p.m. on Friday, April 8, 2005, until around 10:30 p.m. on Saturday, April 9, 2005.  Several witnesses testified that beginning around 6:30 p.m. on Friday evening, Rogers was at a friend's house in Alexandria, Virginia, working on cars with a large group of friends.  See J.A. 2908-09, 2918-20, 2922, 2950-52, 2961-66, 2999-3001.  One friend, Michael Diggs ("Diggs"), testified that he and Rogers left to pick up supplies, returned to the house, then drove less than a mile to Diggs' house, where they arrived around 10:30 p.m.  J.A. 2921, 2963-64, 2962-67.  Diggs and another witness both testified that Rogers left shortly afterward.  J.A. 2965-67; J.A. 3013.  A woman whom Rogers had seen socially a few times testified that he arrived at her house in Alexandria around midnight and spent the night.  J.A. 2983-85, 2987.  Cellular phone records documenting the towers through which Rogers' phone calls were routed corroborated this account of his whereabouts.  See J.A. 3214-23.

On Saturday, April 9, 2005, Rogers returned to Diggs' house around 7:00 a.m., left an hour later, and returned again around 9:00 a.m.  J.A. 2967, 2973-74, 2986, 2988.  Later that morning or in the early afternoon, he attended a racing event at a track in Maryland with his sons and a large group of friends; several witnesses testified that he spent the entire afternoon there.  J.A. 2923, 2927, 2938-39, 2954, 2956, 2967-68, 3002-3004, 3013-

16, 3257, 3268-72.  Rogers left with the group around 7:00 p.m.; after a brief stop at Diggs' house to switch vehicles, Rogers went with Diggs and a few others to a friend's house.  J.A. 2968, 2975, 3004-06, 3015-17.  Rogers was still there when Diggs left around 10:00 p.m.  J.A. 2968-69, 2976-79.  Cellular phone records also corroborate this testimony.  See J.A. 3222-26. Thus, Rogers' alibi from 6:30 p.m. on Friday, April 8, 2012, until 10:30 p.m. on Saturday, April 9, 2012, was supported by cellular phone records and testimony from several witnesses.

Rogers also introduced alibi evidence for the time period after 10:00 p.m. on Saturday, April 9, 2005, but it was significantly weaker, resting primarily on the testimony of Rogers' son, Adrian Thomas ("Thomas").[3]  Thomas testified that he, his brother JJ Nicholson, Rogers, and Rogers' girlfriend returned to Rogers' girlfriend's house in Springfield, Virginia, late in the evening.  J.A. 2307-08, 3277.  According to Thomas, Rogers never left the house that night, and he heard Rogers' snores from his bedroom, where he stayed up watching a particular movie and some television shows until around 2:30 a.m.  J.A. 3277-88, 3291.  This testimony, however, was called

---

[3] Rogers' older son, JJ Nicholson, testified that although he remembered being at the track with his father and returning home, he did not remember what happened after he returned home or who was at home with him.  J.A. 3257-58.  Rogers' girlfriend testified that she went to bed shortly after arriving home from the track and was asleep until morning.  J.A. 2339; 2372-74.

into question on cross-examination.  See, e.g., J.A. 3290
(testifying that he "was not sure" when he had last spent the
night at Rogers' girlfriend's house and that he did not remember
what movies or TV shows he watched on earlier visits); J.A.
3290-92 (insisting that Rogers returned home five minutes before
he did because he was "paying attention to the clock," but
unable to explain how he could know when Rogers returned to the
house if Rogers arrived first).  Moreover, unlike the alibi
evidence for Friday evening and earlier on Saturday, Thomas'
testimony received little corroboration from the cellular phone
records.  At 10:30 p.m., an outgoing call made from Rogers'
phone was routed through a tower close to his home, J.A. 3226,
3244-45, and an incoming call was routed through that same tower
around 11:45 p.m, J.A. 3226, 3245-47.  The incoming call was not
answered, however, and was routed directly to voicemail.  Id.
In fact, no outgoing calls were made, and none of the incoming
calls were answered, on Rogers' phone from 10:35 p.m. on
Saturday until 11:30 a.m. on Sunday.  J.A. 3245-46.  Therefore,
Rogers did not have a strong alibi for the time period after
10:30 p.m. on Saturday.

Because evidence of Rogers' alibi was strong for the period
until 10:30 p.m. on Saturday, April 9, 2005, but weak for the
period afterward, both sides vigorously contested the precise
time of Madaris' death during the four-day period she was

6

missing.  See J.A. 1432-33, 3456.  The prosecution argued that
Madaris was killed closer to, rather than further from, 10:50
a.m. on Sunday, April 10, 2005, when her body was discovered;
that is, after 10:30 p.m. on Saturday night, when Rogers' alibi
evidence was weak.  See, e.g., J.A. 3485-87 (emphasizing "sooner
rather than later").  The defense, on the other hand, argued
that she died "more toward twenty-four hours from the time her
body was discovered"; in other words, before 10:30 p.m. on
Saturday night, when Rogers' alibi evidence was strong.  J.A.
3460; see also J.A. 3458-60, 3468-74.

     To support their arguments, both sides presented expert
witnesses estimating time of death based on the forensic
evidence.  One defense expert and the prosecution expert
testified that the forensic evidence was inconclusive as to
whether Madaris died before or after 10:30 p.m. on Saturday,
April 9, 2005.  See J.A. 3079, 3082 (defense expert testifying
that although "it is not reasonable to say that death must have
occurred, say, within twelve hours of the time of the body being
discovered," the evidence was not "completely inconsistent" with
less than twelve hours passing between death and discovery
(emphasis added));  J.A. 1846, 1928-29 (prosecution expert
testifying that Madaris probably died "less than a day" before
her body was discovered, but agreeing that it could have been
more than twelve hours before, and that it was "more toward the

twenty-four than [the] three or four" hour end of the range).
The other defense expert testified that the evidence was "not
consistent" with a time of death of twelve hours or less before
discovery.  J.A. 3153.  All of the experts agreed that the time
of death estimates depended on many factors and could not be
estimated with absolute precision.  See J.A. 1842-46, 3079,
3082, 3150-53.

    The factors considered by the expert witnesses included not
only environmental factors, such as the weather and the body's
exposure, but also the stage of various biological processes
within Madaris' body itself.  See J.A. 1842-45, 3079-87, 3110,
3151-53.  Two biological processes received particular
attention: livor, whereby blood sinks within a body due to
gravity; and rigor, in which biochemical reactions cause a body
to stiffen, then later return to flaccidity.  See J.A. 1792-95,
1842-44, 3080, 3109-12.  Livor becomes "fixed," meaning that the
blood no longer moves from where it pooled, approximately four
to six hours after death.  J.A. 1843-44.  Rigor sets in
gradually, but the entire body becomes stiff and rigor is "full"
approximately six to twelve hours after death.  J.A. 1792-95,
1842-43, 1913, 3080, 3110.  Stiffness remains for around twelve
hours, then dissipates over another approximately twelve-hour
period.  J.A. 1842-43, 3110.  Although these time periods are

affected by temperature, in normal circumstances the cycle takes around thirty-six hours to complete.   J.A. 1842-43, 1913, 3110.

When the autopsy of Madaris' body was conducted on the morning of Monday, April 11, 2005, livor had fixed and the body was in full rigor.   J.A. 1784-95.   The autopsy, however, took place almost a full day after Madaris' body was discovered and after it had been refrigerated for over twelve hours.   J.A. 1473.   Because the experts' time of death estimates used the time of <u>discovery</u> as a baseline, J.A. 1943, 3079, 3153, and because Madaris' body remained at the scene for several hours after it was discovered, J.A. 1473, 1590, the testimony of lay witnesses about their observations of the body's condition at the crime scene and the timing of those observations took on particular importance.   This testimony included:

- Harvey Carey, who discovered Madaris' body, testified that around 10:50 a.m. on Sunday, April 10, 2005, her hands were "[t]ightly clenched," her body was bloated or "puffed up," her face was black, and there were "a lot of bugs."   J.A. 1473-74.

- Deputy John Lennox, a police officer who arrived at the scene around 11:00 a.m. on Sunday, April 10, 2005, testified that Madaris' body "appear[ed] real bloated," that it "seem[ed] very rigid," and that "her fists [were] really clenched."   J.A. 1510-11.

- Detective Jim Harris, who arrived around 12:45 p.m. on April 10, 2005, testified that he observed no insects, J.A. 1560, and that he did not notice any bloating or decomposition other than a "blackness around the area where her face once was," J.A. 1541, 1586.   He further testified that when he put plastic bags over her hands around 3:15 p.m., her "muscles had not stiffened up to a great extent" and he was able to "move her without a great deal of

problems." J.A. 1544-45. Additionally, he testified that when two funeral home employees arrived around 4:00 p.m., he helped them to prepare Madaris' body for transportation. J.A. 1549, 1552-54. According to his testimony, when he did so, he noticed blood on the back of her neck and discoloration on her back, J.A. 1553-54, but observed no discernible stiffness in her body, J.A. 1560. Finally, he testified that Madaris was not transported in her original configuration; instead, her hands were "brought down to the side or placed across the stomach, chest, or something like that." He did not know whether he personally moved her hands, but did testify that he had no difficulty reconfiguring them. J.A. 1560.

- Although neither funeral home employee testified, a stipulation was read into evidence providing that: On Sunday, April 10, 2005, they arrived around 4:00 p.m. and left with the body around 4:25 p.m. When they arrived at the funeral home around 5:15 p.m., they placed her body into a refrigerator unit. They removed her body from that unit around 6:25 a.m. on Monday, April 11, 2005, transported it to the Medical Examiner's Office in Richmond, Virginia, and turned it over to the Medical Examiner shortly before 7:30 a.m. J.A. 1590-91.

At trial, both sides gave Detective Harris' testimony about the absence of stiffness in Madaris' body particular attention because it conflicted not only with other witnesses' observations of stiffness, bloating, and "clenched hands," but also with the expert witnesses' testimony that flaccidity at the scene was not possible, considering that the body was in full rigor during the autopsy. See J.A. 1919, 3130-31.

On August 29, 2006, the jury convicted Rogers of capital murder, first-degree murder, rape, abduction, and arson. Pet. at 1; Br. in Supp. at 1. He was sentenced to life without parole on the capital murder charge and to 38.5 years on the lesser charges. Pet. at 1; Br. in Supp. at 1.

10

Rogers appealed his conviction to the Virginia Court of Appeals, which denied his appeal. Rogers v. Commonwealth, No. 2954-06-04 (Va. Ct. App. Aug. 9, 2007) (per curiam). Upon Rogers' motion for consideration by a three-judge panel, he was allowed to fully brief and argue two of his claims;[4] the three-judge panel nonetheless affirmed his conviction. Rogers v. Commonwealth, No. 2954-06-04 (Va. Ct. App. Sept. 1, 2009). The Virginia Supreme Court denied his petition for appeal, Rogers v. Commonwealth, No. 092003 (Va. July 1, 2010), and the United States Supreme Court subsequently denied his petition for certiorari. Rogers v. Commonwealth, 131 S. Ct. 663 (2010).

Although Rogers' trial attorneys agreed to represent him in state post-conviction proceedings, they did not timely file a state habeas corpus petition. Pet. at 24-25. On November 23, 2011, Rogers filed the instant federal claim.

## II.   DISCUSSION

In Rogers' petition, he argues for the first time that he received ineffective assistance of counsel during his trial, as well as when his lawyers failed to file a state post-conviction petition.[5] He also renews three claims that he argued on direct

---

[4] Rogers did not renew either of those claims in the instant petition.

[5] A federal court generally may not consider a habeas corpus petition when the petitioner has failed to timely exhaust his state court remedies. See 28 U.S.C. § 2254(b). Rogers argued

appeal, namely (1) that the Stafford County process for grand
jury selection systematically excluded women and young people
and therefore violated his due process and equal protection
rights under the federal Constitution, (2) that the Virginia
alibi notice rule is unconstitutional, and (3) that the trial
court's decision not to give jury instructions on immediate
perpetrator liability and second degree murder deprived him of a
fair trial.  Pet. at 7, 13, 24, 30, 33, 37; Resp. at 1-2.  All
of his claims are without merit.

A. **Standard of Review**

When a claim raised in a federal habeas petition has not
been adjudicated on the merits by the state court, a federal
court reviews the claim de novo.  Cone v. Bell, 556 U.S. 449,
472 (2009); Winston v. Kelly, 592 F.3d 535, 553-54 (4th Cir.
2010).  In contrast, when a state court has passed on the merits
of the claim, a federal court may grant a habeas petition only
if the state court's decision is "contrary to, or involved an
unreasonable application of, clearly established Federal law as

---

that his procedural default should be excused because his
counsel effectively abandoned him under Maples v. Thomas, 132 S.
Ct. 912 (2012), when they failed to file his state habeas corpus
petition.  See Reply to Motion to Dismiss [Dkt. No. 7] at 2.
The Order issued by this Court on March 22, 2012 [Dkt. No. 17],
held that Rogers had made a sufficient showing of ineffective
assistance of counsel to excuse his procedural default under
Martinez v. Ryan, 132 S. Ct. 1309 (2012).  Therefore, Rogers'
ineffective assistance of trial counsel claims will be
considered on the merits.

determined by the Supreme Court of the United States," or if the decision "is based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). This standard is "highly deferential" and "difficult to meet." Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam); Harrington v. Richter, 131 S. Ct. 770, 786 (2011)) (internal quotation marks omitted).

Courts must accord independent meaning to the "contrary to" and "unreasonable application" clauses. Terry Williams v. Taylor, 529 U.S. 362, 406 (2000). Specifically:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 412-13. Whether a state court's application of federal law is "unreasonable" must be determined using an objective standard. Id. at 409-10.

No Virginia court has adjudicated Rogers's ineffective assistance of counsel claims; they will therefore be reviewed de novo. Because the Virginia state courts decided Rogers' other claims on the merits, however, they will be reviewed under § 2254(d).

13

**B. <u>Ineffective Assistance of Counsel Claims</u>**

To establish ineffective assistance of counsel, Rogers must show both that (1) "counsel's performance was deficient" and that (2) "the deficient performance prejudiced the defense." <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  Deficient performance occurs when "counsel's representation fell below an objective standard of reasonableness."  <u>Id.</u> at 688.  To establish prejudice, Rogers must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694.  A showing that "the errors had some conceivable effect on the outcome of the proceeding" is not enough; a reasonable probability requires that the errors are "sufficient to undermine confidence in the outcome." <u>Id.</u> at 693, 694.  In short, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u> at 687.

Rogers argues that his trial lawyers deprived him of his constitutional right to effective assistance of counsel because they did not interview Dale Weaver ("Weaver") and David Pruett ("Pruett"), the two funeral home employees who transported Madaris' body from where it was discovered to a funeral home for refrigeration.  Pet. at 7-9.  According to Rogers, his trial counsel were deficient because they "failed to understand the

14

tremendous value of Mr. Pruett and Mr. Weaver's observations and neglected to take the minimal amount of time necessary to speak with them." Pet. at 10. Rogers also contends that Weaver and Pruett's affidavits, attached as exhibits to his petition, establish that his defense suffered prejudice because (1) the testimony of either would have "totally destroyed" the credibility of prosecution witness Detective Harris and because (2) the testimony of either would have left "no substantial prosecution evidence in the record to counter the defense theory that rigor had set in by the time the body was discovered." Pet. at 12. Rogers would therefore have been acquitted, the argument goes, because if rigor had set in by the time the body was discovered, then Madaris' death must have occurred before 10:30 p.m. on Saturday, August 9, 2005, "during that portion of Mr. Rogers' alibi which was undisputed." Reply at 11.

Regardless of whether the performance of Rogers's trial counsel was deficient,[6] his claim fails because he has not demonstrated that his defense was prejudiced by his counsel's failure to interview the two potential witnesses. See McHone v. Polk, 392 F.3d 691, 704 (4th Cir. 2004) ("If [petitioner] fails to demonstrate sufficient prejudice from certain acts or

---

[6] Given how diligently Rogers' counsel mounted his defense, by not only introducing extensive alibi evidence, but also attacking point by point the prosecution's theory of the case, there is little evidence to support Rogers' claim that their performance was deficient.

15

omissions, we need not decide whether counsel's performance in those respects was, in fact, deficient under Strickland." (citation omitted)).

Weaver and Pruett's affidavits directly contradict only a few elements of Detective Harris' trial testimony. Weaver and Pruett state that they handled Madaris' body without assistance from any police officers; Detective Harris testified that he assisted them. Compare Pruett Aff. ¶ 4, and Weaver Aff. ¶ 6, with J.A. 1552-54, 1559. The affidavits are also in tension with some of Detective Harris' observations about the body: He testified that he observed no insects, no bloating, and no decomposition other than a blackness around her facial area. J.A. 1541, 1560, 1586. In contrast, the affidavits state that "she was slightly bloated," Pruett Aff. ¶ 3; that "her body was not peached or whitish, as it would appear shortly after death, but was beginning to become discolored and turning brown and green," Weaver Aff. ¶ 4; and that "there were flies flying around the body," id. The affidavits do not, however, directly contradict Detective Harris' testimony that her body was flaccid at the scene because they do not specifically address the body's rigidity. Moreover, although Rogers emphasizes the statements in the affidavits that no police officer crossed Madaris' arms across her body, see Pet. at 8-9; Pruett Aff. ¶ 4; Weaver Aff. ¶ 6, these statements in fact do not directly conflict with

16

Detective Harris' testimony, which was that her hands were "brought down to the side or placed across the stomach, chest or something like that," and that he did not know whether he personally made the reconfiguration, J.A. 1560 (emphasis added).

The conflicts between the affidavits and Detective Harris' testimony are insufficient to establish that Rogers' defense was prejudiced.  First, as Rogers himself concedes, other evidence presented at trial contradicted Detective Harris' testimony about the condition of the body when it was being moved.  Pet. at 8 ("Drs. Gormley and Daniel made clear that [Detective Harris' testimony] was not possible, testifying that the body could not have been flaccid at the scene then in full rigor less than one hour later."); see also J.A. 1919, 3130-31.  Testimony from Weaver or Pruett contradicting Detective Harris' contention that he participated in preparing Madaris' body for transportation, and by inference casting doubt on his testimony about the condition of her body at that time, would have added support to the impeachment evidence that defense counsel did in fact introduce; however, their testimony would not have changed the nature of the evidence presented at trial.

Second, the flaccidity or rigidity of Madaris' body when it was being transported, though important, was not dispositive. Rigor was only one of many factors that the expert witnesses considered when estimating the time of Madaris' death.  See J.A.

17

3135-69 (basing a time of death estimate not on rigidity, but on decomposition, the prevailing weather conditions, and the presence or lack of insect activity); J.A. 1842-45 (testifying about several "features or variables" that forensic pathologists use to "narrow down time of death"); J.A. 3066 ("[W]hen you're trying to assess a time of death, you really want to use more than one -- more than one indicator, because a single indicator is not necessarily completely reliable"). Moreover, the experts emphasized that time of death estimates could not be made "to the accuracy that you would like to have." J.A. 1842; see also J.A. 3079 ("[T]o try to narrow the time of death to a particular window is not something that I feel is possible in this case.").

Finally, and most importantly, the circumstantial evidence presented by the prosecution linking Rogers to the murder was so substantial that the entire dispute over the state of the victim's body does not "undermine confidence in the conviction." Strickland, 466 U.S. at 694. The circumstantial evidence included:

- Testimony that during an altercation between Rogers and Madaris on March 4, 2005, he screamed at her, threw his keys at her, chased her up a set of external stairs, grabbed her by her hair, tried to pull her backwards over the banister, and "kept saying you're dead, you're dead, dead bitch walking, you're dead." J.A. 2479-83.
- A letter written by Rogers to Madaris saying that "[n]ot only was I going to stomp the hell out of you, but kick your ass all over the street." J.A. 1654-55, 1714-15, 2394-98, 2394-2400; see also Prosecution Ex. 90. This

18

threat is consistent with Madaris' manner of death, which was blunt force to the head sufficient to break some of her teeth and jaw parts away from her skull and to remove her face entirely.  <u>See</u> J.A. 1539, 1557-58, 1934-36.

- Testimony from several witnesses that Rogers and Madaris arrived at Brittany's separately; Rogers rode his motorcycle, and Madaris arrived in her car.  J.A. 1952, 1966, 1981, 1985-86, 2000, 2023, 2043-44, 2240, 2916, 2933. One witness testified that the motorcycle was still in the parking lot around 12:30 a.m.  J.A. 2037.

- Testimony from two eyewitnesses at Brittany's bar on April 6, 2005, that a woman and a man were arguing loudly as they were leaving the bar, and that he forcefully pulled her out of the driver's seat of her car, kicked her, and then used his foot to shove her in her rear end into the back seat. J.A. 2029-36, 2079-84.  One witness testified that the man then closed the door to the back seat, sat in the driver's seat, and "peeled out."  J.A. 2036-37.  Although their testimony about the woman's clothing and the man's description was somewhat inconsistent, their testimony about the incident itself was largely the same.  One witness identified Rogers as the man; the other did not. J.A. 2038-39, 2090-93.

- Cellular phone records showing that after leaving Brittany's bar on Wednesday, April 6, 2005, calls from Rogers' cell phone were routed through towers in Stafford County, not far from where Madaris' car and body were discovered.  J.A. 2244-46, 2253-57.

- Testimony from Stephanie Beier, Rogers' girlfriend at the time of these events, that during the night of Wednesday, April 6, 2005, she awoke to a call from Rogers asking her to pick him up in Woodbridge.  J.A. 2314-17.  Because he was not there when she arrived around 11:00 p.m., she called him; he told her to pick him up at the Misty Ridge apartment complex across the street.[7]  J.A. 2318-20.  When she arrived at the complex, he got out of a car that she had never seen before and told her to take him to Brittany's; when they arrived, she dropped him off at his motorcycle, which was parked close to the bar entrance. J.A. 2320-24.  Because she needed to use the restroom, she drove her truck and he rode his motorcycle to a nearby gas

---

[7] Two witnesses testified that in late 2003 through January 2004, Madaris and Rogers had lived together at the Misty Ridge apartment complex in Woodbridge.  J.A. 2259-60, 2465-66.

station; when she came out of the restroom, she saw him
pumping gas into a red gas can that she had never seen
before.   J.A. 2325-27.   He put the can into her truck and
they drove separately back to her home, where she
immediately went back to bed and he went outside; she
testified that she did not know what if anything he did
later that night.   J.A. 2328-30.

- Cell phone records showing that Rogers' calls were routed
  through cellular towers in Stafford County at 2:46 a.m. on
  Thursday, April 7, 2005.   J.A. 2244-46, 2253-57.   Rogers
  presented no alibi evidence for this time period.

- Madaris' burned car was found at a construction site
  parking lot in Stafford County later that morning, around
  8:00 a.m.   J.A. 2105-07.   The driver's seat of the car was
  reclining and pushed all of the way back.   J.A. 2790; see
  also J.A. 3379; Prosecution Exs. 302, 303.   Rogers is over
  six feet tall; Madaris was smaller.   See Resp. at 20.
  Rogers' calls were again routed through Stafford County
  cell towers during the afternoon of that day.   J.A. 3243.

- Cellular phone records indicating that no cell phone calls
  were placed from Rogers's cell phone to Madaris' after
  April 6, 2005, even after Rogers had heard from her friends
  and family that she was missing.   J.A. 2269-70.   During the
  month before Madaris disappeared, in contrast, about 600
  phone calls were placed from Rogers's phone to Madaris' and
  approximately 200 phone calls were placed from Madaris'
  cell phone to Rogers'.   J.A. 3312-13.

- Testimony that sperm belonging to Rogers was found inside
  Madaris' body during the autopsy.   J.A. 2554-58.   The
  defense conceded that it was his sperm.   J.A. 3461.   Some
  sperm were "intact," meaning that heads and tails were
  still attached, and some sperm still had attached heads,
  but no attached tails.   J.A. 2559.   Prosecution experts
  testified that because the sperm sample was taken from
  Madaris' vaginal pool, the proportion of intact sperm meant
  that intercourse more likely occurred within 24 hours of
  her death, J.A. 2591-93, 2760-61, 2776-80, although they
  could not "specifically pinpoint [a] time" or rule out the
  possibility that it happened earlier, J.A. 2583, 2779-80.
  The defense experts testified that the evidence did not
  support an estimate of when the sperm was deposited.   J.A.
  2866, 3078.

- A recorded phone call that Rogers made from jail to his
  son, JJ Nicholson ("Nicholson"), on August 15, 2005, the

20

day after he was arrested.  J.A. 2678, 2682, 2698.  During
the call, Rogers asked his son to dispose of his "Tims,"
short for his Timberland boots, which he said were in the
basement of his girlfriend's house.  J.A. 2698-2708.
Nicholson testified that after he found the boots, he
called his uncle, who put them into a black plastic bag and
threw them away in a dumpster at a restaurant where they
had stopped to eat.  See J.A. 2700-01, 2706-08, 2715-17.
Nicholson further testified that the boots thrown away
looked like a picture of Timberland Chukka boots.  J.A.
2706-08.  An earlier witness had testified that the
Timberland Chukka boot model had class characteristics
matching one set of impressions taken from the field where
Madaris' body was found.  J.A. 1622-23.  When Rogers called
Nicholson the next day, August 16, 2005, he asked whether
Nicholson had done what he was told; this call was also
recorded and played for the jury.  J.A. 2702-04.

Given the weight of this evidence, the absence of Weaver's and

Pruett's testimony is not sufficient to meet the Strickland

standard for prejudice.  Rogers's first claim of ineffective

assistance of counsel must therefore fail.

Rogers also argues that his counsel were ineffective

because they failed to preserve for appeal objections to

purportedly improper remarks about the time of death evidence

made by the prosecution during the rebuttal portion of its

closing argument.  Specifically, the prosecutor argued: (1) that

Madaris must have been alive on Saturday night because when Dr.

Gormley conducted the autopsy of Madaris' body on Monday

morning, "[r]igor had not yet had the thirty-six hours that it

takes for it to go away, to dissipate and to never come back,"

J.A. 3489; and (2) that the time of death estimates should be

calculated back from "when [Madaris was] refrigerated.  It's the

21

only thing that makes any sense," J.A. 3505, because "Lisa Madaris lay in that field -- after discovery, but lay in that field until almost 5:30 on Sunday afternoon," J.A. 3504. <u>See</u> Pet. at 13-15. This claim also fails for lack of prejudice.

The trial court denied Rogers' motion for a new trial on the merits. J.A. 3520-21. On direct appeal, the Virginia Court of Appeals <u>sua sponte</u> dismissed Rogers' argument as procedurally defaulted because his defense counsel had failed to move for a mistrial "when the objectionable words were spoken." <u>Rogers v. Commonwealth</u>, No. 2954-06-4, at 6 (Va. Ct. App. Aug. 9, 2007) (quoting <u>Yeatts v. Commonwealth</u>, 410 S.E.2d 254, 264 (1991) (Va. 1991)) (internal quotation marks omitted). Although his counsel did object and did move for a mistrial, they did not follow Virginia rules of procedure, which require that the objection and motion be made contemporaneously. <u>Id.</u> at 6-7.

Had defense counsel properly preserved the claim, the Court of Appeals would have applied a deferential standard of review to the trial court's decision because "whether to grant a motion for mistrial lies within a trial court's exercise of discretion." <u>Green v. Commonwealth</u>, 266 Va. 81, 102 (2003) (holding that "[u]nless we can say that the trial court's determination was wrong as a matter of law, we will not disturb its judgment on appeal."). Under Virginia law, "[w]hen a motion for mistrial is made, based upon an allegedly prejudicial event,

22

the trial court must make an initial factual determination, in the light of all the circumstances of the case, whether the defendant's rights are so 'indelibly prejudiced' as to necessitate a new trial." Id. (quoting Spencer v. Commonwealth, 240 Va. 78, 95 (1990)) (internal quotation marks omitted).

In this case, when the defense objected that the Commonwealth's statements mischaracterized the scientific evidence, the trial court overruled the objection, observing that "[e]ach of you will have an opportunity to characterize and have had an opportunity to characterize the evidence. The jury will be the finders of fact." J.A. 3489 (emphasis added). When the defense later moved for a mistrial and argued that they should at least have been allowed to rebut the prosecution's statements, the court denied the motion, stating that "[m]y recollection of what I said is that both sides will have or have had an opportunity to argue the evidence. I did not use the word, rebuttal, that I'm aware of." J.A. 3521. Because the statements made by the prosecutor were not so prejudicial that Rogers' right to a fair trial was violated, there is no reasonable probability that the Virginia Court of Appeals would have overruled the trial court's decision.

### C. Other Claims

Rogers also argues that: (1) Stafford County systematically excludes women and young adults from grand jury service,

23

violating the federal Constitution, Pet. at 30; (2) Virginia's alibi notice discovery rule is unconstitutional, Pet. at 33; and (3) the trial court's failure to give the jury instructions for lesser included offenses deprived Rogers of a fair trial, Pet. at 37.

Rogers alleges that the Stafford County procedure for selecting grand jurors violated both his due process and his equal protection rights. Pet. at 31. In his due process argument, however, he has not cited Supreme Court precedent clearly establishing that a defendant's federal due process rights are violated by the underrepresentation of women or young people on grand juries.

Rogers relies heavily on Peters v. Kiff, 407 U.S. 493 (1973), which held that "whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race." Id. at 504 (opinion of Marshall, J.). There was no majority of the Court as to the source of law for their holding, and more recent Supreme Court cases have declined to clarify the issue. See, e.g., Campbell v. Louisiana, 523 U.S. 392, 400 (1998); Hobby v. United States, 468 U.S. 339, 350 (1984). The other cases Rogers cites address a criminal defendant's right to have a petit jury selected from a fair cross section of the community. See Duren v. Missouri,

24

439 U.S. 357 (1979) (striking down a Missouri statute that systematically excluded women from jury service as unconstitutional under the Sixth and Fourteenth amendments); Taylor v. Louisiana, 419 U.S. 522 (1974) (same).  In contrast, "a state defendant has no right to a grand jury that reflects a fair cross-section of the community."  Castaneda v. Partida, 430 U.S. 482, 509 (1977) (Powell, J., dissenting).  Because Rogers cannot point to Supreme Court precedent "clearly establish[ing]" the due process right that he asserts, the decisions of the state courts cannot be contrary to, or constitute unreasonable applications of, that precedent.  Therefore, he cannot meet his burden under § 2254(d).

In the equal protection context, the Supreme Court has held that the Constitution is violated when a recognizable, distinct class has been substantially underrepresented in the grand jury population over a significant period of time.  Castaneda, 430 U.S. at 494 (majority opinion).  A showing of disparate impact alone is insufficient; the defendant must present statistical evidence sufficient to give rise to an inference of purposeful discrimination.  See id. at 493 ("[S]ubstantial underrepresentation of the group constitutes a constitutional violation . . . if it results from purposeful discrimination." (emphasis added) (citations omitted)).

At the trial court hearing on this issue, defense counsel presented evidence that:

- Women comprise about 50% of the county's voting age population, but made up only 28% of the grand jury lists during 2002, 21% during 2003, 27% during 2004, and 33% during 2005, the year that Rogers was indicted.  J.A. 346-47.

- Individuals aged 18-34 comprise approximately 35% of the county's voting age population, but made up less than 3% of the grand jury lists during the 2002-2005 period.  J.A. 356-57.

This evidence did not take into account the statistical impact of the statutorily required qualifications for grand jury service, nor did it account for statutory exemptions from jury service.[8]  J.A. 365-66, 373-74, 378-79.  The state trial court found that the defense had not "demonstrated that the grand jury process is a form of systematic exclusion," J.A. 398, and the Virginia Court of Appeals affirmed that decision.  Neither decision was unreasonable and therefore neither may be disturbed on habeas review.  See 28 U.S.C. § 2254(d)(2).

Rogers also renews his argument, rejected on direct appeal, that Virginia's alibi notice rule is unconstitutional under

---

[8] For example, every grand juror must have been a resident of Virginia for at least one year, and of the county of the court for at least six months.  Va. Code § 19.2-195.  Exemptions are allowed upon request for many categories of people, including those "who ha[ve] legal custody of and [are] necessarily and personally responsible for a child or children 16 years of age or younger," and "mother[s] who [are] breast-feeding a child."  Va. Code § 8.01-341.1(8).  Moreover, all people with felony convictions are disqualified from jury service.  Va. Code § 8.01-338.2.

Wardius v. Oregon, 412 U.S. 470 (1973), and its progeny.  In Wardius, the Court struck down an Oregon statute that required defendants claiming an alibi defense to disclose where they claimed to have been, and the names and addresses of the witnesses on which they planned to rely because "Oregon grant[ed] no discovery rights to criminal defendants, and, indeed, [did] not even provide defendants with bills of particulars." Id. 472 & n.5, 475.  In contrast, the Supreme Court upheld a Florida rule requiring defendants to disclose their alibi and alibi witnesses when the prosecution was "required to notify the defendant of any witnesses it proposes to offer in rebuttal to that defense." Johnny Williams v. Florida, 399 U.S. 78 (1970).

Under the Virginia rule at issue in this case, a defendant raising an alibi defense must disclose to the prosecution where he claims to have been, but is not required to provide the names and addresses of any witnesses.  Va. Sup. Ct. Rule 3A:11(c)(2). Although the rule itself does not require the prosecution to disclose in return when the crime was committed, the indictment must "state that an offense occurred on or about a certain date." Va. Code § 19.2-220.  Additionally, and unlike the rule in Wardius, defendants are entitled to petition for a bill of

particulars.  See Va. Code § 19.2-230.[9]  Because the rule does not fall squarely under either Wardius or Williams, the Virginia Court of Appeals decision denying Rogers' argument on appeal was not contrary to clearly established Supreme Court precedent. Moreover, because Virginia defendants have methods available to them for obtaining the time of the offense from the prosecution, it also was not an unreasonable application of that precedent. Rogers has therefore failed to meet the § 2254(d) standard.

Finally, Rogers claims that the trial court's refusal to give jury instructions on immediate perpetrator liability and second-degree murder violated his constitutional rights under Beck v. Alabama, 447 U.S. 625 (1980).  Beck held that a death sentence may not be constitutionally imposed "when the jury was not permitted to consider a verdict of guilt of a lesser-included non-capital offense and when the evidence would have supported such a verdict."  Id. at 627; see also Hopper v. Evans, 456 U.S. 605, 611 (1982) ("[D]ue process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction." (emphasis in original)). In Rogers' trial, as the Virginia Court of Appeals observed,

---

[9] In fact, Rogers did petition for such a bill, but it was denied.  When he appealed that denial, the Virginia Court of Appeals rejected his argument, noting that he was present at an arraignment in which his counsel said that they understood "that [Madaris] was killed within twenty-four hours of being discovered on the 10th."  Resp. at 62-63; Rogers v. Commonwealth, No. 2954-06-4, at 2-3 (Va. Ct. App. Aug. 9, 2007).

"[n]o evidence was presented that someone other than [Rogers] committed the crimes" and Rogers' "defense was that he was not present during the incidents." Rogers v. Commonwealth, No. 2954-06-4, at 7 (Va. Ct. App. Aug. 9, 2007) (per curiam). The evidence therefore did not support the instructions Rogers requested, and the decision of the Court of Appeals was not contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court.[10]

## III.   CONCLUSION

For the reasons stated above, Respondent's Motion to Dismiss will be granted, Rogers' petition will be dismissed, and Rogers's requests for discovery and for an evidentiary hearing will be denied by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 27th day of August, 2012.


Alexandria, Virginia                        /s/

                                        Leonie M. Brinkema
                                        United States District Judge


---

[10] Respondent argues that this claim is procedurally defaulted because Rogers failed to raise the constitutional argument on direct appeal, Resp. at 65, and Rogers seems to concede the point, Reply at 22 (arguing that default was excused due to ineffective assistance of counsel on direct appeal). Because this Court finds that the claim fails under § 2254(d), the issue of procedural default need not be addressed.